UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COURTNEY LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-01712-JPH-TAB |
| | ) | |
| JENNIFER FRENCH et al., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Courtney Long is a prisoner who alleges that Defendants wrongfully confined him in segregated housing—essentially solitary confinement—for extended periods of time between 2011 and 2022. He brings claims under 42 U.S.C. § 1983 for violations of his Fourteenth Amendment due process rights and his right to be free from retaliation for engaging in constitutionally-protected activity. Defendants, who work for the Indiana Department of Correction ("IDOC") or IDOC contractors, have filed motions for summary judgment. Dkts. [62], [65]. For the reasons below, those motions are **GRANTED IN PART AND DENIED IN PART**.

**I.**
**Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the

record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Long and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

**A. The Parties**

Mr. Long is a prisoner who has been in the custody of the IDOC for nearly 15 years. During that time, he has been housed at multiple prisons, including Pendleton Correctional Facility, Wabash Valley Correctional Facility, New Castle Correctional Facility (which is operated by GEO Group, Inc.), Westville Correctional Facility, and Indiana State Prison. Mr. Long's current earliest expected release date is in 2036. Dkt. 77-1.

Defendants are employees of the IDOC and GEO Group, who worked at IDOC's Central Office and the prisons where Mr. Long has been housed. During the relevant timeframe of the events alleged in Mr. Long's complaint, Defendants Hendrix and Basinger worked at the IDOC Central Office; Defendants French, Fitch, Joseph, Sanford, Dickerson, and Sevier worked at New Castle; Defendant Marshal worked at Wabash Valley; and Defendant Peterson worked at Pendleton. Their respective positions and job duties relevant to this case are summarized below:

| Name | Position | Duty station |
|---|---|---|
| Jack Hendrix | Executive Director of Classification, 2011-present | IDOC Central Office |
| Mr. Hendrix's role, with respect to overseeing classification, "includes receiving recommendations from facilities for offender admittance to and release from department-wide administrative restrictive housing status." Dkt. 63-1 at 1 (Hendrix affidavit). | | |
| James Basinger | Deputy Commissioner of Operations, 2013-present | IDOC Central Office |
| | | |

| Mr. Basinger's role, in part, is to oversee the IDOC classification division. Dkt. 63-5 at 1 (Basinger affidavit). | | |
| --- | --- | --- |
| Robert Marshall | Lead investigator, Office of Investigations and Intelligence, 2014- October 2016 | Wabash Valley |
| Mr. Marshall's job included making recommendations regarding inmates' restrictive housing status at Wabash Valley. Dkt. 63-6 at 1 (Marshall affidavit). | | |
| Walter Peterson | Internal investigator, 1980-2020 | Pendleton |
| Tina Dickerson | Caseworker, March 2021-April 2023 | New Castle |
| Ms. Dickerson was assigned to New Castle's restrictive housing unit between October and December 2021. Part of her duties were to participate in and document periodic reviews of inmates who were in restrictive status housing, including Mr. Long's reviews between October and December 2021. Dkt. 63-8 at 1 (Dickerson affidavit). | | |
| Christopher Sanford | IDOC Investigator and correctional police officer, August 2018- present | New Castle |
| Mr. Sanford sometimes provides recommendations on whether an inmate should be in restrictive housing. Dkt. 63-9 at 1 (Sanford affidavit). | | |
| Sammy Joseph | GEO Group Investigator, present | New Castle |
| Mr. Joseph was personally involved with Mr. Long's restrictive housing placement reviews at New Castle. Dkt. 67-5 at 1 (Joseph affidavit). | | |
| Scott Fitch | Assistant Warden, 2006- present | New Castle |
| Jennifer French | GEO Group Assistant Facility Administrator | New Castle |
| Ms. French was personally involved with Mr. Long's restrictive housing placement reviews at New Castle. Dkt. 67-7 at 1 (French affidavit). | | |

4

| Mark Sevier | Warden, present | New Castle |

**B. IDOC Segregation Policies and Procedures**

IDOC prisoners are ordinarily housed in what is referred to as "general population" but may be assigned to segregated or restricted housing in the form of administrative segregation, also referred to as restrictive housing, and disciplinary segregation. Although New Castle is operated by GEO Group, it still is subject to IDOC rules and regulations and oversight of inmates' restrictive housing classifications. *See* dkt. 67-5 at ¶ 6.

Administrative segregation, or restrictive status housing, may be imposed at the facility level or department-wide level: "(1) facility administrative restrictive status housing ("ARSH"); and (2) department-wide administrative restrictive status housing ("DW-ARSH")." Dkt. 63-1 at 1. Placement in either type of administrative segregation "shall be based on the" (1) threat to life, self, staff, other offenders, or property; (2) threat to the orderly operation and security of a facility; and (3) regulation of an inmate's behavior that has not been within acceptable limits. *Id.* at 4-5 (copy of IDOC Policy 02-01-111). Final decisions regarding ARSH placement are made at the facility level. Dkt. 63-1 at 1-2. Final decisions whether to place an inmate on DW-ARSH are made by regional directors at IDOC central office, with input from facility staff and central office classification staff, including Mr. Hendrix. *Id.* at 2.

Disciplinary restrictive housing or segregation, like administrative segregation, may be facility-based ("DRSH") or department-wide ("DWRH-D").

Dkt. 77-1 at 36-37 (copy of IDOC Policy 02-04-102). A prisoner is placed in disciplinary restrictive housing or segregation as a sanction imposed by the Disciplinary Hearing Board. Under the Disciplinary Restrictive Housing Regulations, "[a]dmission of an offender to a disciplinary restrictive status housing unit shall be documented in the unit log," along with completion of State Form 39588. *Id.* at 40. The policy also does not allow an offender to "remain on disciplinary restrictive status housing longer than the given disciplinary sanction imposed by the Disciplinary Hearing Board." *Id.* at 44.

### C. Mr. Long's Time at Pendleton: 2011 – January 2015

While at Pendleton, Mr. Long was found guilty of disciplinary violations related to trafficking cell phones. Dkt. 73 at 1-2 (Long Affidavit). As a sanction, he was ordered to serve time in disciplinary segregation; according to IDOC records, the last period of disciplinary segregation during Mr. Long's time at Pendleton would have ended in April 2013. Dkt. 63-4 at 1 (Long's IDOC Disciplinary Records). While serving disciplinary sanctions at Pendleton, Mr. Peterson approached Mr. Long and told him he could make Mr. Long's "situation go away" if he cooperated with further investigation into cellphone trafficking. *Id.* at 2-3. After Mr. Long refused to cooperate, Mr. Peterson said "he would have me moved further away from my family to the SHU at Wabash for a couple of years, 'to see if you change your mind.'" Mr. Long still refused to cooperate. *Id.* at 3.

### D. Mr. Long's Time at Wabash Valley: January 2015 – June 2018

In January 2015, Mr. Long was transferred to Wabash Valley. *See* Dkt. 63-1 at 3. Mr. Long was immediately assigned to a segregated or restrictive housing

unit where he remained until his June 2018 transfer to New Castle. *Id.* Upon arriving at Wabash Valley, Mr. Marshall came to Mr. Long and said "that I should debrief and give a statement involving trafficking" at Pendleton. Dkt. 73 at 3. Mr. Long declined, and Mr. Marshall then said, "he would never recommend me to be placed back into general population unless I played ball with their investigation." *Id.* at 3.

Mr. Long started at Wabash Valley with a department-wide disciplinary restrictive housing designation, but that designation was changed to department-wide administrative restrictive housing in September 2016. *Id.* At that time he entered the ACT program with the goal of transferring back to general population.[1] *Id.* But he was later approached by unidentified OII officers and told he needed to cooperate with Mr. Peterson about the cellphone trafficking investigation or he would be removed from the ACT program. *Id.* In November 2016, after Mr. Long said he would not cooperate, he was removed from the ACT program and continued in segregation. *Id.* Mr. Long returned to the ACT program in March 2017 but was again removed from it in August 2017. *Id.* at 4.

In his affidavit, Mr. Long states that he was not in DWRH-D at Wabash Valley but instead was in DW-ARSH, at least from September 2016 onwards. Dkt. 73 at 3.[2] He has also designated emails between IDOC staff, including Mr.

---

[1] "ACT" apparently refers to the IDOC's Actions, Consequences, and Treatment Program. *See Isby v. Brown*, 856 F.3d 508, 516 (7th Cir. 2017).

[2] According to Mr. Hendrix's affidavits, Mr. Long was in DWRH-D for the entirety of his stay at Wabash Valley. Dkt. 63-1 at 3; dkt. 75-1 ("As a technical matter, Long may have been classified as in administrative restrictive housing, but this was not the purpose for his being in restrictive housing.").

Hendrix and Mr. Basinger and then-IDOC Commissioner and non-defendant Robert Carter, about having "the RH (DS, AS, PC) time verified for the offenders on the attached list [including Mr. Long]. I think there may be some discrepancies." Dkt. 73-1, at 36. A response indicates that Mr. Long was "listed as DS under RH Type and should be AS." *Id.* at 35.

On August 18, 2017, Commissioner Carter emailed Mr. Hendrix, stating about Mr. Long that "16 months is quite awhile. I would consider giving him a chance." *Id.* at 37. Mr. Hendrix responded, cc'ing Mr. Basinger, "Sure is. His conduct has cleaned up quite a bit and if he has finished Phase 4 he should be ready to return to their GP. I have call into the facility for their report and status on where he is in the review process." *Id.* Mr. Basinger forwarded this email to Janna Anderson, who is not a defendant and worked as administrative secretary at Wabash Valley. Ms. Anderson responded, "Interesting. . . . I believe OII believes him to be a security concern, however I'm sure Jack will find out for sure." *Id.*

On August 21, 2017, Mr. Hendrix wrote Commissioner Carter, cc'ing Mr. Basinger, "After checking further and discussing his status with Wabash staff, he is not an AS offender, but rather is serving disciplinary segregation sanctions. Although his conduct record has shown marked improvement, his current disciplinary sanction release date is May 18, 2018 [] due to a lengthy period of conduct issues involving cell phones and possession of controlled substances." *Id.* at 38. The email also referred to an ongoing OII investigation into suspected

8

trafficking between Mr. Long and his non-incarcerated brother, noting that there was insufficient evidence to file any charges related to those suspicions. *Id.*

The designated evidence contains documentation of periodic reviews for potential removal from restrictive housing at Wabash Valley, but only beginning in September 2016. From September 2016 through August 2017, the monthly reviews were named "Department Administrative Restrictive Status Housing Review." Dkt. 73-1 at 19-21, 25, 27-29, 31-33. Those reviews said, "Your status has been reviewed and there are no changes recommended to the Executive Director of Operations at this time. Your current Department Administrative Restrictive Housing Status shall remain in effect unless otherwise rescinded by the Executive Director of Operations." *Id.*

In September 2017, after Mr. Hendrix discussed Mr. Long's segregation status with Wabash Valley staff, the monthly reviews were renamed, "Department Disciplinary Restrictive Status Housing Review." Dkt. 75-2. Every one of these reviews said, "Offender is appropriately placed at this time." *Id.*

Mr. Hendrix testified in an affidavit that Mr. Long "was found guilty of several conduct violations and the Disciplinary Hearing Board sanctioned him to serve time in disciplinary restrictive housing" for the following date ranges while at Wabash Valley:

- November 2014 to May 2015 – 6 months

- May 2015 to November 2015 – 6 months

- November 2015 to February 2016 – 3 months

- February 2016 to August 2016 – 6 months

- August 2016 to November 2016 – 6 months

- November 2016 to February 2017 – 6 months

- February 2017 to August 2017 – 6 months

- August 2017 to February 2018 – 3 months

- February 2018 to May 2018 – 3 months

Dkt. 75-1 at 3.

Defendants have also submitted in support of summary judgment a record of Mr. Long's conduct violations. Dkt. 63-4. The report lists several IDOC guilty disciplinary findings from 2010 to 2014. *Id.* at 2-4. Then, there are three guilty findings from early 2016—for unauthorized possession of property, disruptive behavior, and abuse of mail/telephone/visits. *Id.* at 1. There are no more guilty findings until May 2019. *Id.* This document also lists four occasions on which Mr. Long was penalized with placement in disciplinary segregation for his conduct violations, for 3 months each time, with the last being recorded in January 2013. *Id.*

### E. Mr. Long's Time at New Castle: June 2018 – December 2021

Mr. Long was transferred to New Castle in June 2018 and spent most of the next two-and-a-half years in a "transition unit." Dkt. 73-1 at 15 (April 26, 2021 letter from French to IDOC central office). Although he had three brief stints in facility-based administrative and disciplinary segregation, none was for longer

than two to three weeks. Dkt. 63-1 at 3. Mr. Long's time in the "transition unit" is not recorded as time in segregation by either the IDOC or New Castle.[3]

Mr. Long graduated from the ACT program in December 2018 and the STAND program (another general population reintegration program offered at New Castle) in December 2020. Dkt. 73 at 4. Mr. Long expected to be transferred to general population after completing these programs, but he was not. *Id.* Mr. Long learned in February 2021 from a New Castle caseworker that his completion of these programs was not reflected in the prison's computer system. *Id.* at 5-6. The caseworker said it was "odd" that the completions did not show up in the computer system and that the "administration had something against [him]." *Id.*; *see also* dkt. 73-1 at 12 (copy of STAND review document dated December 17, 2020, stating Mr. Long had successfully completed the program).

In November 2020, Defendants Sanford and Joseph approached Mr. Long about cooperating in the Pendleton trafficking investigation. Dkt. 73 at 4. After Mr. Long again refused to cooperate, Defendants Sanford and Joseph told him he "would never get out of lockup if [he] didn't cooperate." *Id.*

On December 20, 2020, three days after Mr. Long graduated from the STAND program, Mr. Sanford filed a conduct report against him for attempted trafficking of a controlled substance. *Id.* at 4-5. Mr. Long denied the accusations. Before the disciplinary hearing held on February 3, 2021, Defendants Sanford

---

[3] The New Castle "transition unit" has been described as "a step-down program for offenders who have been in restrictive-status housing for several years or longer" but with additional programming available for general population reintegration. *Isby*, 856 F.3d at 516-17.

and Joseph confronted Mr. Long with a camera and said, "if I just debrief this could all go away." *Id.* at 5. Mr. Long refused, *id.*, and he was found guilty after the disciplinary hearing. *See Long v. Warden*, 1:21-cv-01806-TAB-SEB (S.D. Ind.), dkt. 9-9. Mr. Long was sanctioned with 45 days commissary suspension, 90 days lost credit time, and a demotion in credit class, but he was not ordered to be placed in disciplinary segregation. *Id.* Mr. Long pursued habeas corpus relief, which this Court denied. *Id.* at dkt. 14.

Also in February 2021, Defendants Sanford and Joseph searched Mr. Long's cell and found a controlled substance, which Mr. Long denies he possessed. Dkt. 73 at 5.[4] On February 13, 2021, Mr. Long was assigned to ARSH, and he would remain in segregation for his remaining time at New Castle, until December 30, 2021. Mr. Long also had disciplinary findings at New Castle in May 2019 for disorderly conduct, in November 2019 (twice) for being in an unauthorized area and having an intoxicating substance, in February 2020 for being in an unauthorized area, in June 2020 for possession or use of a controlled substance, in February 2021 for fighting, in March 2021 for having an intoxicating substance, and in June 2021 for unauthorized possession of property. Dkt. 63-4 at 1.

In March 2021, Mr. Long asked Ms. French when he could expect to be moved back to general population. Defendant French responded, "you have to help yourself Mr. Long, they're not going to release you back to population unless

---

[4] It appears that Mr. Long sought habeas relief for this disciplinary finding, which this Court denied. *See Long v. Warden*, No. 1:21-cv-02056-JRS-DML (S.D. Ind.), dkt. 14.

you sit down with them and tell them what you know." *Id.* at 6. Mr. Long again refused to cooperate. *Id.*

In April 2021, Ms. French wrote a letter to IDOC central office requesting permission for Mr. Long to participate in the STAND program. Dkt. 73-1 at 15. The letter refers to a previous request by New Castle for Mr. Long to be transferred to a different facility, which IDOC had denied.[5] *Id.* The letter states that Mr. Long had previously been unsuccessful in the STAND program. *Id.* It also refers to Mr. Long having accumulated "five major conduct reports and three minor conduct reports" since arriving at New Castle. *Id.* In September 2021, Warden Sevier wrote a similarly-worded letter to IDOC central office, requesting that Mr. Long be assigned to department-wide administrative restrictive housing status. *Id.* at 17. At some point thereafter, Mr. Long was assigned DW-ARSH.[6]

After Mr. Long was transferred to ARSH at New Castle, he received weekly status reviews, beginning February 24, 2021. *See* dkt. 67-2 at 7. Unlike the reviews at Wabash Valley, these reviews are reflected on State Form 56670, "Facility Restrictive Housing, Protective Custody, and Department Wide Restrictive Housing (DWRH) Review." *Id.* The form includes multiple boxes to check if an inmate is to be continued in segregation: "Threat to facility security"; "Escape risk"; "Additional observation needed"; "Overall negative adjustment";

---

[5] No details or communications regarding that request are in the designated evidence.

[6] Mr. Hendrix's affidavits in support of summary judgment state that Mr. Long was in ARSH until he was transferred to Westville, when the designation was changed to DW-ARSH. Dkts 63-1 at 3; 75-1 at 2.

"Recent negative adjustment"; "Protective custody (PC)/safekeeping"; "Failure to adjust"; and "Other (Explain in comments)". *Id.*

On the vast majority of the reviews after February 24, 2021, only the boxes "Additional observation needed" and "Other" are checked. *Id.* The "Comments" section for checking the "Other" box contains minimal information, usually "Admin Hold." *Id.* at 7, 10-16, 18, 20-27, 30-33, 35, 37-38, 41-44, 46-49. Some of the reviews refer to awaiting directives "from Central Office," apparently referring to a decision either to transfer Mr. Long to another facility or to be placed in department-wide administrative segregation. *See, e.g., id.* at 37. On May 5, 2021, the boxes "Overall negative adjustment" and "Failure to adjust" also are checked. *Id.* at 20.

### F. Mr. Long's Time at Westville: December 2021 – May 2022

At the end of December 2021, Mr. Long was transferred to Westville on DW-ARSH status. Dkt. 63-1 at 3. On May 13, 2022, he was released from segregation altogether and transferred to Indiana State Prison in general population. Mr. Long's periodic reviews at Westville are similar to those he received at New Castle while in ARSH—forms filled out by hand at first on a weekly basis by a caseworker, then after February 2022 every thirty days. Dkt. 67-2 at 62-75.[7]

---

[7] Mr. Long's complaint originally named, in addition to the current defendants, three caseworkers at Westville: Thomas Krause, D. Malfese, and C. Carroll. *Id.* at 8. Mr. Long later stipulated to a dismissal of these caseworkers as defendants in this action. Dkt. 44.

### G. Conditions of Segregation

Mr. Long testified in his affidavit that there was little practical difference between the conditions in long-term administrative segregation and those in disciplinary segregation. He testifies that, unlike inmates in general population, he was locked in his cell 23 hours a day, with one hour per day of solitary recreation time. Dkt. 73 at 1-2. He was always shackled and cuffed when taken out of his cell. Showers were limited to three times a week, and sometimes less. *Id.* Sometimes the hot water turned was turned off in the showers to discourage showering. *Id.* Mr. Long ate all his meals alone. *Id.* A security light was left on in his cell 24 hours a day. *Id.* He had limited visitation, and no physical contact allowed with any visitors. *Id.* He was routinely strip searched and frequently had reading materials confiscated. *Id.* He was surrounded by screaming and/or suicidal inmates. *Id.* Guards sometimes turned the air conditioning up in the cells very high and then sealed the cells off to make it extremely cold in the cells. *Id.*

Mr. Long also testified that his conditions of confinement were similar during his time in the New Castle "transition unit." *See id.* at 1 (describing these conditions as applying to all years while in segregation from 2011 to 2022); dkt. 72 at 3 (Long's brief in response to summary judgment alleging "over six years in administrative segregation after serving at least five years on disciplinary segregation"); dkt. 77 at 2-3 (Long's summary judgment sur-reply brief). Defendants do not dispute Mr. Long's description of the conditions of confinement in the "transition unit."

### H. Procedural History

Mr. Long brought this case in August 2022, dkt. 1, and is proceeding on claims that Defendants violated his Fourteenth Amendment due process rights and that they retaliated against him because of his refusal to cooperate in an internal affairs investigation, dkt. 10 (screening order). He alleges that he was designated to and remained in segregated housing because he would not cooperate with IDOC officials' investigation of cell phone trafficking. He further alleges that he was not given meaningful periodic reviews to determine whether there were legitimate reasons to keep him in segregated housing.

Two groups of Defendants have separately moved for summary judgment. Dkt. 62 (Defendants Hendrix, Basinger, Peterson, Marshall, Sanford, and Dickerson ("Group 1 Defendants")); dkt. 65 (Defendants French, Joseph, Sevier, and Fitch ("Group 2 Defendants")).

### III.
### Discussion

Before turning to the merits, the Court addresses Mr. Sanford's argument that he was no longer a defendant in this action after the Court issued its screening order pursuant to 28 U.S.C. § 1915A. Dkt. 62 at ¶ 5. While the screening order did not list Mr. Sanford as a defendant against whom the due process and retaliation claims were proceeding, dkt. 10 at 3, that did not result in Mr. Sanford's dismissal from this case. On the contrary, other aspects of the screening order and Mr. Sanford's own actions made clear that he remained in the case as a defendant. First, his name was not included on the list of defendants whom the Court directed to be terminated from the docket. *Id.* at 5.

Second, Mr. Sanford was issued process along with the other defendants. *Id.* at 7. Third, Mr. Sanford waived service and answered the complaint on the merits, dkts. 14 and 18. Fourth, he did not move to dismiss the complaint against him (as expressly allowed by the screening order) based on lack of notice or for failure to state a claim, or raise this issue prior to summary judgment. Finally, he does not cite any authority for the proposition that the screening order's failure to expressly include him as a defendant in the body of the order now precludes further consideration of any claims against him. Instead, his brief addresses Mr. Long's claims against him on the merits. The Court will do likewise.

### A. Retaliation

Defendants Peterson, Marshall, Sanford, and Joseph argue they are entitled to summary judgment on Mr. Long's retaliation claims because Mr. Long has not shown a link between his exercise of the right not to incriminate himself and a decision to place and keep him in segregated housing. Mr. Long responds that there are disputed material issues of fact in that regard.

The Court's screening order did not specify whether Mr. Long's retaliation claims would fall under the First or Fifth Amendments. *See* dkt. 10 at pp. 3, 5. Regardless, all Defendants "acknowledge that Long 'engaged in protected activity when he refused to provide information to [OII] . . . .'" Dkt. 64 at 11 (Group 1 Defendants' summary judgment brief) (quoting *Vermillion v. Levenhagen*, 2018 WL 2321112 (S.D. Ind. 2018)); *see also* dkt. 66 at 11 (agreeing "that refusal to cooperate in an investigation is a Constitutionally protected activity.") (Group 2 Defendants' summary judgment brief). The Group 1 Defendants' brief, as well as

the *Vermillion* opinion it cites, refers to both the First and Fifth Amendments as the source of the right not to cooperate in an internal prison investigation.

Mr. Long asserts that he repeatedly invoked his right not to answer questions or cooperate at all. "Plaintiff disputes any and all allegations that he was not retaliated against for asserting his right to remain silent in order to deter him from asserting his right to remain silent in the future." Dkt. 71 ¶ 4. This arguably implicates the Fifth, rather than the First Amendment, though the issue is not firmly settled in the Seventh Circuit. *See Thomas v. Gomez*, 2024 WL 2248273 at n.5 (N.D. Ill. 2024). "The weight of authority suggests that an inmate's refusal to cooperate with a prison investigation is not protected speech unless the inmate invokes his Fifth Amendment right against self-incrimination." *Id. See also McKinley v. Schoenbeck*, 731 F. App'x 511, 514 (7th Cir. 2018) (holding inmate had First Amendment right to truthfully answer investigators' questions by expressly denying knowledge of gang activity).

In *Caffey v. Maue*, 679 F. App'x 487, 490 (7th Cir. 2017), the Seventh Circuit stated, "prisoners may be compelled to disclose information during internal investigations provided they are not punished for refusing to make self-incriminating statements," that is, by offering the prisoner immunity from prosecution for answers he or she may give. (citing *Riggins v. Walter*, 279 F.3d 422, 430 (7th Cir. 1995)). Put another way, the Fifth Amendment gives a person the right "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). This

18

right applies in the prison disciplinary context, and prison officials may violate a prisoner's right against self-incrimination if a prisoner's silence alone results in punishment of the kind capable of compelling waiver of the right. *See Minnesota v. Murphy*, 465 U.S. 420, 434 (1984); *Baxter v. Palmigiano*, 425 U.S. 308, 317 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995).

In *Caffey*, the Court held that the prisoner had failed to state a Fifth Amendment retaliation claim because he had not alleged that his statements to investigators might incriminate him. *Caffey*, 679 F. App'x at 490. Here, by contrast, a reasonable jury could infer from the context that by steadfastly refusing to be interviewed, Mr. Long was invoking his right against self-incrimination—he had previously been disciplined for his involvement with cell phone trafficking and prison officials' statements show that they wanted to know more about his involvement. Defendants therefore do not dispute that Mr. Long's answers to investigators' questions about cellphone trafficking might have incriminated him in a future criminal proceeding. *See, e.g.*, Ind. Code § 35-44.1-3-5(b) (Level 5 felony trafficking with an inmate if the contraband is a cellphone); Ind. Code § 35-44.1-3-8 (Class A misdemeanor possession of a cellphone while incarcerated). And there is no designated evidence that Mr. Long was offered immunity from criminal prosecution in exchange for cooperating with investigators.

Defendants argue that they are entitled to summary judgment because there is no evidence that Mr. Long's refusal to cooperate was a motivating factor in his placement or retention in segregation. Defendants agree that the elements

of a Fifth Amendment retaliation claim are parallel to a First Amendment retaliation claim. Such claims therefore require a plaintiff "to show that the speech or activity was constitutionally protected, a deprivation occurred to deter the protected speech or activity, and the speech or activity was at least a motivating factor in the decision to take retaliatory action." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). "The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680. This element may be proven by circumstantial evidence, which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action. *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013). "Suspicious timing alone will rarely be sufficient to create a triable issue because suspicious timing may be just that— suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Manuel*, 966 F.3d at 680 (cleaned up) (standing alone, fact that inmate's cell was shaken down nine minutes after he engaged in First Amendment protected activity could not create triable issue of fact as to retaliation claim because another, non-retaliatory motive existed).

In *McKinley,* an inmate asserted that prison investigators retaliated against him for denying any knowledge regarding gang activity, which was characterized as a First Amendment claim. The Seventh Circuit reversed the district court's grant of summary judgment in favor of several of the prison

officials. First, it held that the inmate's placement in segregation for three years was adequate evidence of "adverse action likely to deter future First Amendment activity." *McKinley*, 731 F. App'x at 514. Second, the inmate provided evidence that several prison officials made comments such as that they could be the inmate's "'best friend or wors[t] nightmare' and that he 'better give them something to go off of.' The timing of McKinley's placement in segregation coupled with these comments could allow a reasonable jury to infer that McKinley's protected speech was a motivating factor for his placement in segregation." *Id.* Additionally, while defendants there designated evidence that the inmate was placed in segregation for "safety and security" reasons, there was also contrary evidence, "tending to show that the defendants' rationale was a pretext and that the real reason he was placed in segregation was retaliatory animus." *Id.* at 515. The Court pointed to evidence showing a 4-year gap between the inmate's last disciplinary guilty finding and his initial placement in segregation, the lack of evidence that the inmate actually was a security threat, the length of time the inmate was held in segregation, "and the number of times officers interviewed him, as though they expected his answers to the same questions to change to ones they liked." *Id.*

Accepting the veracity of Mr. Long's affidavit for summary judgment, his retaliation claims are based on the following:

- At Pendleton, Mr. Peterson told Mr. Long, after he was disciplined for cellphone trafficking, that Mr. Long's "situation [could] go away" if he cooperated with further investigation into cellphone trafficking. Dkt. 73 at

2-3. After Mr. Long refused to cooperate, Mr. Peterson said "he would have me moved further away from my family to the SHU at Wabash for a couple of years, 'to see if you change your mind' . . . ." *Id.* at 3. Mr. Long refused to cooperate with Mr. Peterson and was transferred to Wabash Valley a short time thereafter for reasons that are not clear in the record.

- At Wabash Valley, Mr. Marshall told Mr. Long that he would never recommend his return to general population unless he "played ball with their investigation." *Id.* Mr. Long refused to cooperate, and he never was returned to general population during the three-and-a-half years he was at Wabash Valley, despite not incurring any new disciplinary charges during that time. (As noted, Mr. Marshall left his employment at Wabash Valley in October 2016).

- At New Castle, Defendants Sanford and Joseph told Mr. Long in November 2020 that he "would never get out of lockup if [he] didn't cooperate" with the Pendleton trafficking investigation. *Id.* at 4. By that time, Mr. Long had graduated from the ACT program and was about to graduate from the STAND program, expecting to be reintegrated into the general population. However, these graduations were not recorded in New Castle's computer system. Mr. Long learned in February 2021 from a New Castle caseworker that these completions for some unknown reason were not reflected in the prison's computer system. *Id.* at 5-6. Also, shortly after Mr. Long's December 2020 STAND graduation, Defendants Sanford and Joseph initiated disciplinary proceedings against him. Shortly before the

disciplinary hearing on this matter, Defendants Sanford and Joseph confronted Mr. Long and said, "if I just debrief this could all go away." *Id.* at 5. Mr. Long refused, *id.*, and he was found guilty after the disciplinary hearing. Also in February 2021, Defendants Sanford and Joseph searched Mr. Long's cell and found a controlled substance, which Mr. Long denies he possessed.

Construing the above evidence in a light most favorable to Mr. Long, there are material questions of fact as to whether Defendants Peterson, Marshall, Sanford, and Joseph retaliated against him because of his refusal to cooperate into ongoing investigations of cellphone trafficking. Mr. Long's sworn statements support an inference that Mr. Peterson had a say in Mr. Long's transfer from Pendleton to Wabash Valley and his remaining in segregation at that time, and that Mr. Peterson was motivated to do so at least in part because of Mr. Long's refusal to cooperate. Mr. Long's sworn statements also support an inference that Mr. Marshall had a say in Mr. Long's remaining in segregation at Wabash Valley, at least through October 2016, and Mr. Marshall was motivated to do so at least in part because of Mr. Long's refusal to cooperate.

Finally, Mr. Long's sworn statements support an inference that Defendants Sanford and Joseph would not have pursued disciplinary action against him, but for his invoking his right not to cooperate in a prison investigation. There is more than just "suspicious timing" here—there is the timing of Mr. Long's refusal to cooperate plus evidence of statements by Sanford and Joseph to Mr. Long, as well as the "misplacing" of his ACT and STAND

graduations while at New Castle. Just as in *McKinley*, there is sufficient evidence to survive summary judgment on Mr. Long's claims that Defendants Peterson, Marshall, Sanford, and Joseph retaliated against him. Even assuming that there were other factors for Mr. Long's placement and retention in segregation and for his disciplinary findings at New Castle, there still is evidence in the record from which a reasonable jury could find that Mr. Long's refusal to cooperate "was at least a motivating factor" in those actions. *See Manuel*, 966 F.3d at 681. These Defendants' motions for summary judgment are therefore denied with respect to these claims.

Mr. Long has not designated evidence that any of the remaining Defendants were personally involved in any alleged retaliation. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.*

Ms. French is alleged to have told Mr. Long in March 2021 that "they're not going to release you back to population unless you sit down with them and tell them what you know." Dkt. 73 at 6. While this statement may reflect that Ms. French knew that others were retaliating against Mr. Long, it does not show that she had any role or participated.[8] And there is no evidence of any kind that

---

[8] Such evidence, however, could be relevant to alleged retaliation by Defendants Joseph and Sanford.

any other defendant did so. So, the remaining Defendants—French, Sevier, Hendrix, Basinger, Dickerson, and Fitch—are entitled to judgment as a matter of law on Mr. Long's retaliation claims against them. *See McKinley*, 731 F. App'x at 514-15 (affirming summary judgment on retaliation claim as to defendant against whom there was no evidence of retaliatory motive in placing inmate in segregation).

### C. Fourteenth Amendment Due Process Claims

#### 1. Due Process Standard

The Fourteenth Amendment to the Constitution does not create a due process liberty interest in avoiding transfer within a correctional facility or remaining in the general prison population. *See Wilkinson v. Austin*, 545 U.S. 209, 222 (2005); *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Instead, an inmate will be entitled to due process protections only when the more restrictive conditions pose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Inmates therefore have no liberty interest in avoiding short-term transfer to segregation for administrative, protective, or investigative purposes, even when they are subjected to harsher conditions as a result. *See, e.g.*, *Townsend v. Fuchs*, 522 F.3d 765, 766 (7th Cir. 2008); *Lekas v. Briley*, 405 F.3d 602, 608-09 (7th Cir. 2005). However, placement in long-term segregation approaching a year or more can implicate a liberty interest, requiring further inquiry into whether the conditions of confinement impose an atypical, significant hardship. *See Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698-99 (7th Cir. 2009) (determination of

whether 240 days in segregation imposed an atypical, significant hardship could not be made at the pleading stage).

If placement in "administrative" segregation meets the "atypical and significant hardship" standard, "the Due Process Clause mandates that prison officials periodically review whether an inmate placed in administrative segregation continues to pose a threat." *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (citing *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)). Although such periodic reviews need not be formal and adversarial, they must be sufficient to ensure that administrative segregation does not become a pretext for indefinite confinement. *Id.* The sufficiency of periodic reviews are evaluated by considering "(1) the private interest (that is, [the inmate's] interest) affected by a governmental decision, (2) the governmental interests at stake, and (3) 'the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

If an inmate is subjected to discipline that results in a lengthening of state custody, the inmate must challenge the discipline in a habeas corpus proceeding under 28 U.S.C. § 2254 before resorting to a lawsuit under 42 U.S.C. § 1983. *See Montgomery v. Anderson*, 262 F.3d 641, 643 (7th Cir. 2001). If such discipline is not successfully challenged, any civil lawsuit based upon it is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). *Morgan v. Schott*, 914 F.3d 1115, 1120 (7th Cir. 2019). And, if an inmate receives a mixed disciplinary sanction of placement in segregation and deprivation of credit time or other sanction

26

resulting in a lengthening of custody, he or she cannot avoid the *Heck* bar by purporting to waive any challenge to the length of custody sanction. *Id.* On the other hand, if an inmate's discipline results only in changes in the conditions of confinement and does not affect the length of custody, the *Heck* bar does not apply to a § 1983 action challenging a placement in segregation. "*Heck* . . . limit[s] only challenges to the fact or duration of a prisoner's sentence, not the conditions of his confinement." *Hall-Bey v. Hanks*, 93 F. App'x 977, 980 (7th Cir. 2004).

### 2. Mr. Long's Time at Wabash Valley: January 2015 – June 2018

In their opening summary judgment brief, the Group 1 Defendants' primary argument regarding Mr. Long's due process claim about his time in segregation in Wabash Valley is that he was in "disciplinary" segregation, and therefore his § 1983 claims are barred by *Heck* unless he first obtains reversal of his disciplinary sanctions. The Group 1 Defendants cite no authority for this proposition and, as discussed above, *Heck* bars a due process claim only when disciplinary sanctions included loss of credit time or other lengthening of a prisoner's sentence. *See Hall-Bey*, 93 F. App'x at 980; *Fleming*, 2021 WL 5919712 at *2. Here, Defendants have not designated evidence, such as unit logbooks, State Forms 39588, or orders from the Disciplinary Hearing Board, showing that Mr. Long was so disciplined in connection with his time in segregation at Wabash Valley.

Moreover, there is a genuine issue of material fact as to which type of segregation Mr. Long was in—disciplinary or administrative—during that time. The IDOC's designated records appear to indicate that Mr. Long was at first

27

classified as being in disciplinary segregation, then it was noted that he should be in administrative segregation, then that determination was reversed after Mr. Hendrix spoke with Wabash Valley staff. Mr. Long's periodic reviews were conducted as department-wide administrative segregation reviews from September 2016 to September 2017, when they were switched to department-wide disciplinary segregation periodic reviews. And before September 2016, there is no designated evidence of what kind of periodic reviews Mr. Long had, if any.

From there, the Group 1 Defendants did not argue in their opening brief that the periodic reviews Mr. Long received at Wabash Valley were constitutionally adequate. They did briefly attempt to do so in their reply brief, but without citation to any authority. Even if the Court were to overlook the Defendants' failure to raise the issue initially and later failure to develop the argument, it is difficult to distinguish this case from *Isby* with respect to the "boilerplate" language and cursory nature of the reviews. *See Isby*, 856 F.3d at 515, 526-29. The Court further is troubled by the shifting and often unsupported explanations, both contemporaneous and in litigation, of whether and when Mr. Long was in "administrative" versus "disciplinary" segregation, from which a jury could infer pretext.

It is undisputed that Mr. Long spent sufficient time in segregated housing to qualify as an "atypical and significant" hardship for due process purposes. Mr. Long had a long stretch of time while in segregation where he was not found guilty of any conduct violations and received the same "boilerplate" reviews of his status. Also, Mr. Long did not receive clear written communication of what

28

he might do differently to change his status. There also is evidence that Mr. Long tried to avail himself of the ACT Program while at Wabash Valley to try to move out of segregation, but was unable to do so for reasons that are unclear. There is evidence from which a jury could infer that the real reason Mr. Long was kept in segregation was because of suspicions he was engaged in ongoing trafficking, but that explanation does not appear in the periodic reviews. Therefore, there is a genuine issue of material fact as to whether Mr. Long's periodic reviews at Wabash Valley were sufficient to meet due process requirements.

Finally, the Group 1 Defendants argue there is no designated evidence from which a jury could find that any of them were personally involved with a deprivation of Mr. Long's due process rights while at Wabash Valley. *See Whitfield*, 76 F.4th at 706. They suggest that because they were not the "final decisionmaker" with respect to Mr. Long's segregation status, they cannot be held liable for due process violations associated with it. But they cite no authority that only a "final decisionmaker" can be held responsible for such violations, likely because that's not the law. To the contrary,

> Any official who 'causes' a citizen to be deprived of [his] constitutional rights can also be held liable [under § 1983]. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of [his] constitutional rights.

*Conner v. Reinhard*, 847 F.2d 384, 396–97 (7th Cir. 1988).

The designated evidence allows a reasonable jury to find direct and personal involvement by Mr. Hendrix in Mr. Long's segregation status at Wabash

Valley and the nature of his periodic reviews there. First, his position at IDOC central office gave him overall administrative oversight over classification and restrictive housing issues at all IDOC facilities. Dkt. 63-1 at 1. Second, there is evidence that Mr. Hendrix was directly involved with Mr. Long's classification status at Wabash Valley. He made sure that Mr. Long should be deemed to be on DWRH-D instead of DW-ARSH. Dkt. 73-1 at 38.

There is also designated evidence that Mr. Marshall was involved in periodic reviews of Mr. Long's segregation status, at least to the extent of making recommendations about inmates' restrictive housing status, up through October 2016, when he left Wabash Valley. Dkt. 63-5. At least for the time frame from January 2015 to October 2016, there is sufficient designated evidence of Mr. Marshall's involvement in a deprivation of Mr. Long's due process rights.

As to Mr. Basinger, he was in a supervisory role at IDOC central office with the classification division being one of his responsibilities. Dkt. 63-5. He also had some personal involvement regarding Mr. Long's restrictive housing status at Wabash Valley. *See* dkt. 73-1 at 36-38. "Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). Something more than generalized knowledge and inaction is required for personal responsibility. Although what additional allegations are required are case-specific, two scenarios are illustrative. First, a supervisor could be actually engaged with the underlying issue such that personal responsibility is present.

30

*See, e.g., Haywood v. Hathaway*, 842 F.3d 1026, 1032-33 (7th Cir. 2016) (holding that the Warden could be held personally responsible for the harm caused by cold prison conditions because the evidence showed he "had actual knowledge of the unusually harsh weather conditions, that he had been apprised of the specific problem with the physical condition of [the plaintiff's] cell (i.e., the windows would not shut), and that, during the time period of [the plaintiff's] complaint, the warden toured the segregation unit himself"). Or second, personal responsibility can be present when the underlying issue is the direct responsibility of the individual in question, rather than one for his or her subordinates. *See Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (holding that the Warden was personally responsible for the alleged cell conditions, and distinguishing Vance, because the Warden "not only knew about the problems but was personally responsible for changing prison policies so that they would be addressed").

Here, there is a question of fact regarding Mr. Basinger's level of personal responsibility and involvement for generally ensuring that classification decisions and restrictive housing statuses and reviews were conducted as required by due process, and that Mr. Long specifically was being afforded due process. Mr. Basinger therefore is not entitled to summary judgment.

There is no evidence of any other named defendant having been personally involved in a potential deprivation of Mr. Long's due process rights at Wabash Valley. Group 1 Defendants Dickerson, Peterson, and Sanford are therefore entitled to summary judgment on this claim. Mr. Long does not argue that any

of the Group 2 Defendants are responsible for deprivation of his due process rights during his time at Wabash Valley, and they likewise are entitled to summary judgment on this claim.

### 3. Mr. Long's Time at New Castle: June 2018 – December 2021

### a. "Transition Unit"

When Mr. Long first arrived at New Castle in June 2018, he was placed in a "transition unit," where he remained until February 2021. He has consistently alleged that regardless of what it was called, it functionally was placement in segregation because the conditions he experienced were similar to those in administrative or disciplinary segregation. None of the defendants have responded to this assertion, except to suggest Mr. Long technically was in neither administrative nor disciplinary segregation during this time.

Moreover, Mr. Long has testified that during that time he was "housed in some form of segregation" the conditions of confinement that he experienced were the same as the other times in segregation. Dkt. 73 at 1–2. And the defendants have not designated evidence that Mr. Long received any kind of meaningful periodic review during this 2.5-year time frame, except for those times when he was briefly and "officially" placed in segregation. There is therefore a material question of fact as to whether Mr. Long's due process rights were violated during his time in the transition unit.

The record also reflects that Warden Sevier and Ms. French were personally and directly involved with Mr. Long's housing placements within New Castle. *See* dkt. 67-5 at 2 (Joseph affidavit) (noting that IDOC classification

32

system applies to New Castle).  So, Defendants Sevier and French are not entitled to summary judgment. There is no designated evidence, however, that Mr. Hendrix and Mr. Basinger personally made specific classification decisions for Mr. Long at New Castle. While they oversaw IDOC classification decisions broadly, *see* dkt. 63-1 at 1; dkt. 63-5 at 1, under § 1983 "supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw*, 910 F.3d at 1029. Mr. Hendrix and Mr. Basinger are therefore granted summary judgment regarding Mr. Long's time at New Castle.

The other remaining defendants from New Castle are also entitled to judgment as a matter of law, because there is no designated evidence that they were personally involved in the decision or implementation of a policy and procedure at New Castle that provided for no periodic reviews at all for inmates placed in the New Castle "transition unit."[9]

### b. ARSH

Mr. Long was transferred to ARSH at New Castle in February 2021. Thereafter, he received weekly periodic reviews, in which a caseworker would make handwritten notations and comments on a form regarding the reasons for Mr. Long remaining in ARSH. *See generally* dkt. 62-7. These reviews were adequate for due process purposes under the circumstances. First, Mr. Long was only in ARSH at New Castle for approximately 10 months. This length of time

---

[9] The Court notes that Mr. Long misidentifies Mr. Fitch as former Wabash Valley warden, whereas he clearly states in his affidavit that he has been New Castle assistant warden since 2006. Dkt. 67-6. There is no reason to doubt this assertion.

could be long enough to trigger the requirement of periodic reviews of the placement, but it's at the low end of the continuum.  Second, although Mr. Long went for long stretches of time at Wabash Valley and during the first part of his time in the "transition unit" without any misconduct findings, that had changed by February 2021, by which time he had accrued several new misconduct findings and would accrue two more after his placement in ARSH. Dkt. 63-4 at 1. Third, although the weekly periodic review forms often do not contain detailed information, they reflect that a caseworker filled them out manually rather than merely printing out repeated "boilerplate" form notices like those Mr. Long received at Wabash Valley. Under *Isby*, lack of detailed explanation in segregation periodic reviews alone does not amount to a violation of due process. Instead, the Court must consider and balance the *Mathews v. Eldridge* factors as applied to a particular situation and inmate.  After doing so here with respect to Mr. Long's ARSH placement at New Castle, the Court concludes no reasonable jury could find that his due process rights were violated by any defendant.[10]

### 4. Mr. Long's Time at Westville: December 2021 – May 2022

With his dismissal of the Westville caseworkers earlier in the litigation, Mr. Long has not now named any defendants who allegedly improperly denied him due process or retaliated against him with respect to his placement in DW-ARSH

---

[10] The Court notes that whether Defendants Joseph and Sanford retaliated against Mr. Long, which led to his placement in ARSH at New Castle, is a separate and distinct question from whether Mr. Long's due process rights were violated with respect to his continued placement in ARSH. *See Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005) ("due process and retaliation claims are analyzed differently. Conduct that does not independently violate the Constitution can form the basis for a retaliation claim, if that conduct is done with an improper, retaliatory motive.").

while at Westville for six months. This also was a relatively brief continuation of his segregation placement that had begun at New Castle after Mr. Long had accrued numerous conduct violations there. Mr. Long received seven-day periodic reviews. They were admittedly perfunctory, even more so than what he received at New Castle, and they sometimes refer to Mr. Hendrix by name, i.e. that Mr. Long was to remain in DW-ARSH "until further notice per Mr. Hendrix." Dkt. 67-2 at 69. But again, these reviews are tied to a placement in segregation following repeated misconduct at New Castle. Additionally, Mr. Long has not provided any testimony or evidence regarding the conditions of confinement at Westville in particular. The Court concludes that no reasonable jury could find a violation of Mr. Long's due process rights by any defendant during this time frame.

### IV.
### Conclusion

Defendants French, Sevier, Hendrix, Basinger, Dickerson, and Fitch are entitled to summary judgment on Mr. Long's retaliation claims, so their summary judgment motions on those claims are granted. As to Defendants Peterson, Marshall, Sanford, and Joseph, there are triable issues of fact regarding whether they retaliated against Mr. Long, and their summary judgment motions on those claims are denied.

For Mr. Long's due process claims, there are triable issues of fact on those claims against Defendants Basinger, Hendrix, and Marshall related to his time in segregation at Wabash Valley, and against Defendants Sevier and French related to his time in the "transition unit" at New Castle. Defendants are

otherwise entitled to summary judgment on the due process claims—that is, related to Mr. Long's time in ARSH at New Castle and his time at Westville. Dkts. [62] and [65] are **granted in part and denied in part in accordance with this order**.

The **clerk is directed to terminate** defendants Dickerson and Fitch as defendants on the docket as they are entitled to summary judgment on all claims against them. No final judgment will issue at this time.

The Court prefers that Mr. Long be represented by counsel for the remainder of this action. The **clerk is directed** to send Mr. Long a motion for assistance recruiting counsel with his copy of this Order. Mr. Long has **thirty days from the date of this Order** to file a motion for counsel using this form motion or to inform the Court that he wishes to proceed pro se. Once the motion has been ruled on and counsel has been recruited, the magistrate judge is asked to schedule a telephonic status conference to discuss further proceedings.

**SO ORDERED.**

Date: 1/21/2025

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

COURTNEY LONG
108201
INDIANA STATE PRISON
INDIANA STATE PRISON
Electronic Service Participant – Court Only

36

Magistrate Judge Baker's Chambers